UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **JUDY L. MARTIN** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER 08-00366-FJP-DLD** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY** | **CONSENT** |

## RULING

Plaintiff Judy L. Martin seeks judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits (DIB) and supplemental security income (SSI) benefits.

### *Background*

Plaintiff protectively filed an application for benefits on May 17, 2006, alleging a disability onset date of October 13, 2005, due to "neck/back problems/hand problems" (TR 92) and depression (TR 63).[1]  The application was denied initially, and a hearing subsequently was held on October 23, 2007.  The plaintiff, her counsel, an impartial medical expert, and an impartial vocational expert appeared and testified at the hearing. (TR 22-46) Plaintiff, who was born on May 23, 1962, was 43 years old at the time of the alleged disability onset date, and had completed the 10th grade. Her past relevant work was as a floor coordinator and laborer.

In denying plaintiff's claims, the Commissioner's administrative law judge ("ALJ") reached the fifth and final step of the five-step sequential disability analysis set forth in 20

---

[1] The initial disability determination lists a primary diagnosis of depression (nos), and a secondary diagnosis of cervical and lumbar spondylosis (TR 47)

1

C.F.R. § 404.1520(b)-(f) & 416.920(b)-(f).[2] The first two steps involve threshold determinations. The ALJ initially determined that plaintiff had not engaged in substantial gainful employment since her alleged onset date of disability, thereby satisfying the first step in the sequential process. (TR 16) At the second step, the ALJ determined that plaintiff suffered from the following severe impairments: degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, and depression. (TR 55)

At step three of the process, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or were medically equivalent to the criteria of one of the listed impairments set forth in the Commissioner's regulations at 20 C.F.R. pt. 404, subpt. P, Appendix 1. (TR 14) The ALJ then determined that plaintiff had a functional capacity[3] ("RFC") to perform light work, with some limitations.[4]

At step four of the sequential process, the ALJ determined that plaintiff was unable to return to her past relevant work. (TR 60) The burden then shifted to the Commissioner at step five of the process to show that plaintiff could perform significant numbers of jobs existing in the national economy, consistent with plaintiff's medical impairments, age, education, past work experience (if any), and RFC. *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001). Based upon the substantial evidence in the record, including the testimony of

---

[2] *See, e.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

[3] Residual functional capacity ("RFC") is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), *citing* SSR 96-8p.

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 CFR 404.1567

a vocational expert during the administrative hearing, and relying on the medical-vocational guidelines as a framework for decision, the ALJ determined that plaintiff was able to perform a significant number of jobs in the national economy, including representative occupations such as housekeeping, food preparation, and survey system. (TR 61) The ALJ therefore concluded that plaintiff was not disabled for purposes of the Social Security Act. (TR 61)

### *Medical History*

The earliest physician visit in the record occurred on March 23, 2004, when plaintiff saw her treating physician, Dr. Raynaldo Banks, for a check-up, and complained of back pain and weight gain. Dr. Banks diagnosed plaintiff with back strain, among other things, and prescribed Bextra, a non-steroidal anti-inflammatory (NSAID) medication. Although lab tests were ordered as part of the physical exam, no x-rays, CT scans, or MRI's were ordered for plaintiff's back pain. (TR 148) Plaintiff returned to Dr. Banks on April 27, 2004, advising that she had fallen three days earlier, and complaining of back pain, and ankle/knee/elbow pain. Plaintiff stated that she had gone to the emergency room following the fall, but that the pain was worse now. The physical exam results included a positive straight leg raise test.[5] Dr. Banks diagnosed plaintiff with a cervical strain and an ankle sprain, and prescribed another NSAID, Cataflam. Dr. Banks also advised that she could continue to take the Lortab prescribed to her by the ER physician. (TR 147)[6]

---

[5]"Lasègue Sign" is the medical term for a "straight leg raise" test. A positive result means that "when a subject is supine with hip flexed and knee extended, dorsiflexion of the ankle caus[es] pain or muscle spasm in the posterior thigh [which] indicates a lumbar root or sciatic nerve irritation." *Stedman's Medical Dictionary*, at 1638 (27th ed. 2000).

[6]The court notes that the emergency room records are not a part of the administrative file, and it is thus unknown if the ER ordered any tests related to plaintiff's fall.

On October 19, 2005, plaintiff went to Med-Aid, an urgent care clinic, complaining that her neck was hurting, along with her left ear. She stated that she "can't move" her neck. Her gait was stable, and her strength and neuro were intact. Plaintiff was diagnosed with cervical sprain and left shoulder pain, and was prescribed a Medrol dose pack, Soma, and Ultram. (TR 181) Med-Aid ordered x-rays for her muscle spasm and pain in her left shoulder AC joint, and the AP and lateral views taken of the cervical spine noted a reversal of the normally lordotic curvature which "suggests cervical muscle spasm." The left shoulder x-ray was normal. (TR 139). Following the x-ray, on October 20, 2005, plaintiff returned to Dr. Banks, complaining of neck stiffness. She was diagnosed with neck strain, and prescribed Soma (a muscle relaxant) and Ultracet (a combination of acetaminophen and Tramadol (a narcotic-like pain reliever). (TR 146)

Dr. Banks then referred plaintiff to Dr. Joseph Boucree, an orthopaedic surgeon, for evaluation and treatment recommendations for her chronic neck, arm, mid back, low back, and leg pain. On November 14, 2005, plaintiff advised Dr. Boucree that she had pain radiating from the neck area down to her hands, and from her lower back down to her feet, which she described as a throbbing pain. Plaintiff also related that she had continued to work as a floor coordinator until November 9, 2005, but that several weeks earlier, she had been seen at Med Aid and received a prescription for oral steroids. Plaintiff's physical exam revealed paraspinal tenderness of the cervical/thoracic/lumbar spine upon palpation and percussion, and moderate restriction secondary to pain for the range of motion of her cervical and thoracolumbar regions. Plaintiff's sensory exams were normal, but she experienced pain upon axial compression, and some motor strength loss (4/5) on C6, L5/S1, and L5. Her toe and heel walks were abnormal as she experienced difficulty with

these tests, and her gait was slightly antalgic/limp. She was hypo-reflexic[7] on C5, C6, C7, and L4, and displayed no reflexes on S1. Lastly, her stretch[8] result was positive for sciatic pain radiating into nerve distribution with or without back/joint pain. (TR 152-155)

After conducting the physical exam, Dr. Boucree's initial impression was that plaintiff had cervical/thoracic/lumbar spondylosis[9] with radiculopathy, shoulder tendinitis, carpal tunnel syndrome, and bilateral knee strain. He recommended an MRI of the cervical and lumbar spines for further diagnostic evaluation, and an EMG and nerve conduction studies of the upper extremities for further evaluation of the severity of her carpal tunnel syndrome. Dr. Boucree prescribed a soft cervical collar and bilateral removable wrist braces, to be worn as needed and as tolerated. (TR 132-138).

On November 15, 2005, Dr. Boucree's referral slip to the Neuro-Technology Institute for the EMG/NCV studies indicates that he had diagnosed plaintiff with "cervical/thoracic/lumber spondylosis with radiculopathy, shoulder tendinitis, carpal tunnel syndrome, knee pain." (TR 167) On November 18, 2005, EMG and nerve conduction studies were administered only on plaintiff's upper extremities, with the result that plaintiff's EMG was normal for her upper extremities. The nerve conduction studies revealed "prolonged distal latency," which was "evidence suggestive of a mild bilateral carpal tunnel

---

[7]"Hypo-reflexia" is a condition in which the reflexes are weakened. *Stedman's Medical Dictionary*, at 863 (27th ed. 2000).

[8]This test is medically referred to as the "femoral nerve stretch test." In this test, which determines " lesions of the third or fourth lumbar disk, the patient lies prone and the knee is passively flexed; the location of pain in the back or thighs indicates which disk is herniated." *Dorland's Medical Dictionary,* (2007 Ed. www.mercksource.com)

[9]"Spondylosis" is defined as "degeneration or deficient development of a portion of the vertebra; commonly involves the pars interarticularis, which can result in a spondylolithesis. *Stedman's Medical Dictionary*, at 1678 (27th ed. 2000).

syndrome (median nerve entrapment at wrist) affecting the sensory and motor components of the nerve." (TR 161).  On November 28, 2005, the MRI of plaintiff's lumbar spine revealed a "[M]ild annular bulge at L4-5 and L5-S1 without evidence of significant central canal or neural foraminal stenosis. No focal disc protrusion." (TR 171) The MRI of plaintiff's cervical spine reveals a "[M]ild disc bulge at C5-6 and C6-7.  There is no significant central canal or neural canal stenosis.  No focal disc protrusion."  (TR 169)

Plaintiff returned to Dr. Boucree on December 2, 2005, after undergoing the MRI's, the EMG and the nerve conduction studies.  Dr. Boucree agreed with the imaging physician's assessment of bilateral carpal tunnel syndrome based on the EMG and nerve conduction studies dated November 28, 2005.  He also concurred with the imaging physician's assessment regarding the MRI of the cervical and lumbar spine.  Plaintiff was advised to continue use of the non-steroidal anti-inflammatory medication, and was allowed infrequent oral muscle relaxants and infrequent oral narcotics for increased severity of the symptoms. As part of his recommendations, Dr. Boucree discussed treatment options with plaintiff, including surgical intervention, and prescribed a TENS unit and a bilateral removable cock-up wrist brace, both to be used as needed and tolerated.  (TR 130-131)

On February 13, 2006, plaintiff returned to Dr. Boucree with continued complaints of neck/arm/back/leg pain.  Dr. Boucree reported that her "back symptoms remain more prevalent with occasional radicular symptoms extending to the lower extremities." Plaintiff advised Dr. Boucree that physical therapy had been helpful, but that her lower back discomfort still persisted.  Dr. Boucree recommended that plaintiff "continue with progressive activities and home exercises from previous physical therapy sessions," and he would continue to attempt to obtain authorization for the use of the TENS unit.  (TR 150)

On February 20, 2006, Dr. Boucree's prescription for the TENS unit states that plaintiff's diagnosis was "cervical/thoracic/lumbar spondylosis with radiculopathy, shoulder tendinitis, carpal tunnel." (TR 168)

On June 2, 2006, plaintiff went to the emergency room of Earl K. Long Medical Center ("EKLMC"), complaining of back and neck pain. While she was ambulating with difficulty, she had a full range of motion in her neck, her neurological signs were intact, and she exhibited "strong/equal grips." She was diagnosed with neck pain. (TR 183)

On July 26, 2006, plaintiff complained of vomiting, and neck/back pain, which was not improving. Her motor strength and reflex tests were normal, but there was mild tenderness in the cervical and lumbar spinal regions. Plaintiff was prescribed Neurontin 300 mg.[10] (TR 237) This dosage of Neurontin was increased to 600 mg on August 31, 2006. (TR 236)

On November 27, 2006, plaintiff was examined by Dr. Roques-Davis at EKLMC. Plaintiff complained of neck pain, hand pain/numbness, and stated the pain made it difficult to sleep. Her motor strength results were 4/5, and Dr. Roques-Davis noted "poor effort." Plaintiff's reflexes were normal for her upper extremities, but not normal for her lower extremities, although she had a negative straight leg raise test. Dr. Roques-Davis diagnosed plaintiff with cervical pain/lumbar pain without signs of radiculopathy or myleopathy. (TR 230)

On April 17, 2007, plaintiff reported to another medical provider that her leg was numb and painful with weakness. The range of motion exam indicated "left hip with pain

---

[10]"Neurontin" is the brand name for gabapentin, which is sometimes prescribed for neuropathic pain.

on abduction and ext. rotation." She was assessed with neck/lower back pain with radicular symptoms. (TR 227)

On April 24, 2007, another MRI of the lumbar spine was taken, revealing the following:

> Degenerative MRI signal changes demonstrated at L4-5 and L5-S1 discs with small focal broad-based left paracentral L5-S1 disc herniation and mild broad-based right-sided L4-5 disc bulge. There is slight contact on the thecal sac and left L1 nerve root at L5-S1 spinal canal with disc herniation without any significant S1 nerve root impingement. There is marked L4-5 foraminal stenosis. Mild degree of L3-4, L4-5, and L5-S1 facet arthopathy with a small amount of fluid within the respective facet joints.

(TR 225)

On June 21, 2007, plaintiff complained of neck/left shoulder pain and was advised to continue with her current medications. (TR 223) On July 12, 2007, plaintiff complained of pain in her lower extremities. The exam indicated a positive straight leg raise test of 60 degrees, and motor strength of 4/5. Her dosage of Neurontin was changed from 600 mg to 900 mg, and she was referred to the Spine Clinic for possible decompression[11] at L4/5. (TR 221)

***Statement of Errors***

In her present appeal, the errors alleged by plaintiff can be summarized as follows:

(1) The ALJ misinterpreted the medical evidence and failed to discuss the findings of a treating physician, which affected his credibility findings, and ultimately the RFC.

(2) The ALJ relied on the VE's testimony, but disregarded the VE's recommendations without explanation.

---

[11]Decompression is the removal of pressure, and a nerve decompression is the "release of pressure on a nerve trunk by the surgical excision of constricting bands or widening of a bony canal." *Stedman's*, at 462.

## *GOVERNING LAW*

In reviewing the Commissioner's decision to deny disability and SSI benefits, the Court is limited to a determination of whether the Commissioner's decision was supported by substantial evidence existing in the record as a whole and whether the Commissioner applied the proper legal standards.  *E.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision does exist, but the Court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment for the Commissioner's even if the evidence preponderates against the Commissioner's decision.  *Id.*  Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion.  *Id.*  A finding of "no substantial evidence" will be made only where there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position.  *Id.*  In order for the Court to find there is "no substantial evidence" supporting the ALJ's conclusions, this court "must conclude that there is a 'conspicuous absence of credible choices' ..." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir.1983) (*citing Hemphill v. Weinberger*, 484 F.2d 1137 (5th Cir.1973)).  "Conflicts in the evidence are for the Secretary and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir.1990) (*citing Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir.1983).

The overall burden of proving disability under the Social Security Act rests on the claimant.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  If a claimant proves that she no longer is able to work in her prior job, then the burden shifts to the Commissioner

to show that there is some other type of substantial gainful activity that the claimant can perform. *Id.* Thus, in cases such as this one where the Commissioner determines that the claimant cannot perform her past relevant work and accordingly reaches the fifth step of the five-step disability sequential analysis, the Commissioner bears the burden of establishing that there is other work in the economy that the claimant can perform. *Perez v. Schweiker*, 653 F.2d 997, 999-1000 (5th Cir. 1981). If the Commissioner adequately points to potential alternative employment, the ultimate burden of persuasion then returns to the claimant to prove her inability to perform those jobs. *Kraemer v. Sullivan*, 885 F.2d 206 (5th Cir. 1989); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fruge v. Harris*, 631 F.2d 1244, 1246 (5th Cir. 1980).

***Arguments of the Parties***

The issue before this Court is whether the Commissioner's finding that Judy L. Martin is not disabled is supported by the substantial evidence and was reached by applying the proper legal standards. 42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ erred in his credibility determination, contrary to what is required by SSR 96-7p and 20 C.F.R. Sec. 404.1529. In support of her argument, plaintiff contends that the ALJ "forgot to mention" Dr. Boucree's report of November 2005 wherein Dr. Boucree stated that claimant had "cervical/thoracic/lumbar spondylosis **with radiculopathy**[12] [emphasis added]" (rec. doc. 14), which is in contrast to the ALJ's decision which stated that the EMG/NCV of November 18, 2005, showed "no evidence of

---

[12]"Disorder of the spinal nerve roots." *Stedman's Medical Dictionary*, at 1503 (27th ed. 2000). Radiculopathy may be caused by such factors as pressure from a ruptured disc or encroachment within a spinal foramen (the intervertebral space through which a spinal nerve passes). *See,e.g.*, 1 J. Travell, M.D. & D. Simons, M.D., *Myofascial Pain and Dysfunction*, at 645 (1st ed. 1983).

radiculopathy" (TR 59), and that the ALJ did not reconcile these "conflicting opinions." Plaintiff also argues that the ALJ neglected the longitudinal nature of her complaints of pain and her persistent efforts to seek treatment, and his finding on plaintiff's credibility was therefore not based on substantial evidence, especially as the State agency physician found plaintiff credible as to her complaints of pain. Plaintiff further argues that two other providers provided evidence of radiculopathic symptoms, and cites to the ALJ's own decision for this argument, but failed to specify which providers. Nonetheless, a review of the ALJ's decision reveals that at least one of these providers would be the April 24, 2007 MRI exam.

In response, the Commissioner points to a November 27, 2006, neurological medical record from Dr. Roques-Davis, wherein plaintiff's straight leg test was negative and her sensation was intact. Dr. Roques-Davis described plaintiff's gait as "okay," and assessed plaintiff with cervical pain without signs of radiculopathy or myelopathy, and lumbar pain without signs of radiculopathy. The Commissioner also contends that no physician opined that plaintiff was incapable of all work, and cites to the ALJ's decision at TR 60 for this proposition.

### *DISCUSSION AND ANALYSIS*

The ALJ's decision must be reversed and remanded because, at its heart, the ALJ's decision is based on a misinterpretation of the medical evidence. This misinterpretation then affected the credibility findings, which in turn affected the determination of the RFC. There are two major factual errors in the ALJ's decision which affected plaintiff's case adversely: (1) that the record does not contain a recommendation for surgery; and (2) that the EMG/NCV testing did not substantiate a diagnosis of radiculopathy.

*Misinterpretation of Medical Evidence*

The ALJ, in determining the severity of plaintiff's physical impairments, evaluated the objective medical record and her subjective complaints of severe pain in her neck and back, and stated as follows:

> Though the claimant currently asserts that she cannot perform any work, the record, including objective testing, does not substantiate the severity of the claimant's pain. (TR 59)
>
> . . .
>
> Notes of July 7, 2007 refer the claimant to the spine clinic for possible decompression at L4-5. However, the record does not contain a recommendation for surgery. (TR 59)
>
> . . .
>
> The claimant has not been referred for surgery intervention. (TR 60)
>
> . . .
>
> EMG/NCV testing did not substantiate a diagnosis of radiculopathy. (TR 60)

These conclusions reflect either a misstatement or a misinterpretation of the record. As one example, the ALJ stated that plaintiff was not referred for surgery intervention, but his own statement regarding the July 7, 2007, notes indicate that plaintiff was referred for a decompression at L4-5, and a nerve decompression is surgery.[13] The ALJ finding of no recommendation or referral for surgery was based on a misinterpretation and misstatement of the July 7, 2007, notes, which affected his credibility findings.

The ALJ also stated that the result of the EMG/NCV testing is somehow supportive of his finding that the plaintiff did not have radiculopathy. The EMG/NCV was conducted

---

[13] *See* footnote 11.

***only*** on plaintiff's ***upper*** extremities in connection with her carpal tunnel syndrome.[14] The EMG/NCV did not test plaintiff's ***lower*** extremities at all. The ALJ's finding of no radiculopathy was based on a misinterpretation and misstatement of the test results, which again affected his credibility findings.

It is long-established law in this Circuit that a credibility choice based upon misinterpretation of medical records and erroneous factual information requires reversal and remand. *See, e.g., Olson v. Schweiker*, 663 F.2d 593, 596 (5th Cir. 1981).[15] In this case, the ALJ's assessment of plaintiff's credibility and subsequent RFC was grounded in his misinterpretation of medical records and errors of fact that were material to his decision, and so must be reversed and remanded for further consideration as the court is unable to conduct a meaningful review of the ALJ's decision to determine if the decision is supported by substantial evidence.

***Other Errors by the ALJ***

Possibly as the result of his misinterpretation of the medical evidence or his misstatement of the facts, the ALJ then failed to discuss and analyze the relevant and significant diagnostic evidence which could provide support for plaintiff's symptoms and complaints of pain. Simply stating the requirements of SSR 96-7p is not enough; the ALJ must provide an analysis for his credibility findings on pain, which did not happen in this decision. Compounding the problem, the ALJ then failed to discuss or give any reasons for completely rejecting any medical evidence contrary to his decision regarding plaintiff's

---

[14] The results revealed "(median nerve entrapment at wrist) affecting the sensory and motor components of the nerve." (TR 161)

[15] *See, e.g., Copeland v. Astrue*, 2009 WL 528243 (W.D. La. 2009) and *Reynolds v. Astrue*, 2010 WL 583918 (N.D. Miss. 2010).

back condition. For example, the ALJ did not mention plaintiff's positive straight leg raise tests on April 27, 2004 (TR 147), and on July 12, 2007 (TR 221), or the results of her neurological physical exam of November 14, 2005, which indicated neuro-anatomic pain distribution, limitation of motion of the spine, reflex loss, and motor loss.[16] Moreover, while the ALJ gave fleeting mention to plaintiff's April 2007 MRI's, he failed to discuss those findings at all. Those objective tests reveal contact on the thecal sac and left S1 nerve root, marked stenosis at L4-5, and facet arthropathy at L3-4, L4-5, and L5-S1. Also, the MRI of April 24, 2007, indicated slight contact on the left S1 nerve root.[17]

Moreover, plaintiff correctly argues that the ALJ failed to address the findings of her treating physician, Dr. Boucree.[18] In fact, the only physician mentioned by name in the decision is Dr. Zimmerman, which was in connection with plaintiff's mental impairments, not her physical impairments. The regulations and circuit law are clear that while it is within the ALJ's discretion to assign greater or lesser weight to the medical evidence, it is not within his discretion to reject the opinion of a treating physician without a detailed analysis of the treating physician's view.[19] In this case, the ALJ was silent as to the medical

---

[16] The court further notes that the ALJ did not identify the listed impairment for which plaintiff's physical systems failed to qualify, or discuss or analyze plaintiff's these symptoms in relationship to any listed impairment, which is contrary to the explicit terms of the statute, and which again results in the court's being unable to conduct a meaningful review of the ALJ's decision. 42 U.S.C. § 405(b)(1). *See also, Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007); *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996)

[17] The ALJ referred to this as the "left L1 nerve root at L5-S1" (TR 59) but could only have meant S1, not L1.

[18] While plaintiff's argument in this regard is not couched specifically in terms of the treating physician rule, it is clear that plaintiff contends that Dr. Boucree's opinion should have been reconciled with the opinion of Dr. Roques-Davis (the doctor first mentioned by the defendants in their brief), which places the argument squarely in the realm of the treating physician rule.

[19] 20 C.F.R. § 404.1527(d)(2), SSR 96-2p. *See also, Reynolds* at *7.

14

evidence provided by Dr. Boucree, leaving the court unable to determine what weight, if any, the ALJ assigned to Dr. Boucree's opinion.[20]

Thus, even if the ALJ had not misinterpreted the medical evidence or misstated the facts, his failure to discuss and analyze plaintiff's pain and other symptoms under SSR 96-7p, and his failure to discuss and analyze the opinion of plaintiff's treating physician results in a finding that the court cannot determine if the ALJ's decision is supported by substantial evidence and was reached by applying the proper legal standard. Therefore, the matter must be reversed and remanded.

As the court has found ample ground to reverse and remand this matter for additional consideration, the court does not address plaintiff's appeal of the ALJ's handling of the VE testimony. Obviously, if the RFC is based on a credibility finding arising out of erroneous facts or misinterpreted evidence, then the hypothetical presented to the VE may also have been incorrect, as would be the ALJ's consideration of the VE's testimony. Nonetheless, that is an issue better addressed at the administrative level during a new hearing.

## ***CONCLUSION***

The decision of the Commissioner denying benefits is reversed and the matter shall be remanded to the Commissioner for further proceedings consistent with the opinion of the Court, including the presentation of any further relevant evidence developed by the

---

[20] Dr. Boucree referred plaintiff for the EMG/NCV tests, and it is these test results which were either misinterpreted or misstated by the ALJ, which may be why the ALJ failed to discuss Dr. Boucree's opinion. Although it is by no means clear, the ALJ may have been under the mistaken belief that Dr. Boucree never found radiculopathy.

parties.[21] The Commissioner shall forward a copy of the Court's opinion to the officer hearing the matter on remand.

Signed in Baton Rouge, Louisiana, on March 4, 2010.

*[signature]*

**MAGISTRATE JUDGE DOCIA L. DALBY**

---

[21] See *Brenem v. Harris*, 621 F.2d 688, 690 n.1 (5th Cir. 1980)("with a remand ordered the hearing should cover all pertinent evidence," including evidence that might not otherwise warrant a remand for new evidence). Relevant evidence may include evidence subsequent to the prior decision and/or subsequent to the expiration of insured status where such evidence is relevant to the determination of whether an impairment existed as well at an earlier time. *E.g., Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).